COLONIAL TRADING, LLC,
Plaintiff–Appellee,

v.

BASSETT FURNITURE INDUSTRIES, INC., Defendant–Appellant.

Colonial Trading, LLC, Plaintiff–Appellant,

v.

Bassett Furniture Industries, Incorporated, Defendant–Appellee.

Nos. 12–2296, 12–2358.

United States Court of Appeals, Fourth Circuit.

Argued: May 15, 2013.

Decided: June 21, 2013.

**ARGUED:** Robert Walker Fuller, III, Robinson Bradshaw & Hinson, PA, Charlotte, North Carolina, for Appellant/Cross–Appellee. June K. Allison, Wishart, Norris, Henninger & Pittman, Charlotte, North Carolina; Pamela Suzanne Duffy, Wishart, Norris, Henninger & Pittman, Burlington, North Carolina, for Appellee/Cross–Appellant. **ON BRIEF:** Nathan C. Chase, Jr., Robinson Bradshaw & Hinson, PA, Charlotte, North Carolina, for Appellant/Cross–Appellee. Robert John Wishart, Wishart, Norris, Henninger &

Pittman, PA, Charlotte, North Carolina, for Appellee/Cross–Appellant.

Before TRAXLER, Chief Circuit Judge; GREGORY and DUNCAN, Circuit Judges.

Affirmed by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

A jury awarded $1,312,665.35 to Colonial Trading, LLC ("Colonial") on its breach of contract claim against Bassett Furniture Industries, Inc. ("Bassett") based on a dispute involving recalled baby cribs. The jury also awarded Colonial $41,472.08 on its North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA") claim, N.C. Gen.Stat. § 75–1 *et seq.*, which the district court trebled under N.C. Gen.Stat. § 75–16. Bassett appeals, challenging the jury instructions, Colonial's UDTPA award, and the damages calculation. Colonial cross appeals the district court's denial of its request for trebled contract damages. For the reasons that follow, we affirm.

## I.

### A.

Colonial is a North Carolina furniture sourcing agent that imports furniture from Chinese companies for sale to American furniture distributors. The distributors make specific product orders through Colonial, who effectively advances the cost of the goods on behalf of the distributor by paying the Chinese company directly for the imported furniture. The Chinese company then releases bills of lading when the goods reach American ports, and Colonial invoices the distributor for the cost of the products.

The case before us involves orders for three crib models, designed by Bassett, which Colonial sourced from Chinese companies, and which Bassett had contracted to resell to Babies'R'Us. In 2005, during the course of the Colonial–Bassett relationship, Colonial signed Bassett's "Import Sourcing Policy"; the policy subjects each import order to Bassett's "standard quality control procedures." J.A. 1249. Additionally, the crib invoices Colonial submitted to Bassett stated that Colonial's product would "be 100% free of manufacturing defects and raw material defects." J.A. 1261.

Under the quality control procedures, Bassett supervised the first production run and paid for third-party auditing of each of the three crib models at issue. Beginning in 2007, however, reports from consumers and internal testing results led Bassett to issue voluntary recalls of each of the three crib lines, damaging its relationship with Babies'R'Us.

Instead of paying Colonial's mounting invoices for the cribs and other furniture products, Bassett attempted to "charge back" its recall costs by crediting those costs against invoices from Colonial, including invoices for furniture other than the cribs in question. Additionally, when Colonial refused to advance more funds to Chinese manufacturers for Bassett's orders, effectively halting the release of the requisite bills of lading, Bassett approached the Chinese manufacturers and paid at least one of them more than the contracted amount for the furniture so the manufacturer would release bills of lading directly to Bassett.[1]

---

1. Specifically, Bassett paid YanRong Furniture ("YanRong"), one of the Chinese crib manufacturers, $300,880 to release bills of lading directly to Bassett; YanRong had

## B.

Colonial sued Bassett in North Carolina court, alleging that Bassett (1) breached its contract with Colonial by failing to pay its invoices, improperly cancelling orders, and applying unauthorized chargebacks; (2) tortiously interfered with Colonial's third-party contracts; and (3) committed unfair and deceptive trade practices in violation of the North Carolina UDTPA, by, among other things, inducing Colonial's suppliers to deal with Bassett instead of Colonial by bribery or coercion. Bassett removed the case to federal court and counterclaimed, alleging that it had properly revoked its acceptance of the cribs because Colonial (1) breached its contract with Bassett; (2) tortiously interfered with Bassett's contracts with manufacturers;[2] and (3) breached its express warranty and implied warranty of merchantability by delivering defective cribs.

After an eight-day trial, the district court reviewed the parties' proposed jury instructions at length before sending the case to the jury. Although the court primarily used its own set of prepared instructions, it did include Colonial's proposed Instruction 16, regarding warranties and manufacturing defects, *see infra* Part II, despite Bassett's objection that the Instruction was "misleading or confusing," J.A. 866.

After deliberations, the jury awarded Colonial $1,312,665.35 on its breach of contract claim and $1 on its tortious interference claim. With respect to the UDTPA, the jury found that Bassett's conduct was in or affected commerce, that Bassett acted with the intent of interfering with Colonial's relationships with its suppliers, and that Bassett committed seven alleged unfair trade practices—all the elements of a UDTPA claim.[3] The jury awarded UDTPA damages of $41,472.08 on the alleged unfair trade practice listed at 3(c)(F) of the verdict form—that Bassett "[i]nduce[d] Colonial's suppliers to deal with Bassett instead of Colonial by bribery or coercion," J.A. 235; *supra* note 3. It awarded $1 in nominal damages on the other six alleged unfair trade practices. The jury denied Bassett's counterclaims, except for its claim for breach of express warranty, which it found Colonial had breached. It awarded $1 in nominal damages to Bassett.

Following trial, Colonial moved for attorneys' fees and treble damages on its breach of contract and UDTPA awards. The district court granted Colonial's request for treble damages with respect to its UDTPA recovery, explaining that, since distinct conduct supported the breach of contract and UDTPA awards, treble UDTPA damages were not duplicative of Colo-

---

billed Colonial $170,000 for the same goods. J.A. 269, 468–69.

**2.** The district court later dismissed Bassett's tortious interference claim.

**3.** Specifically, the jury found, under Number 3(c) of the verdict form, that Bassett: (A) "[o]rder[ed] and receive[d] goods from Colonial for which [it] did not intend to pay"; (B) "[u]nilaterally charge[d] back Colonial for non-defective goods on the false justification that they were defective"; (C) "[u]nilaterally charge[d] back Colonial for expenses which were not permitted under any contractual ob-

ligation under the false justification that they were proper charge back expenses"; (D) "[w]ithout justification incur[red] unnecessary expenses associated with the recall with the intent to improperly charge back Colonial for such expenses"; (E) "[p]a[id] Colonial's suppliers and persuade[d] Colonial's suppliers not to deal with Colonial"; (F) "[i]nduce[d] Colonial's suppliers to deal with Bassett instead of Colonial by bribery or coercion"; and (G) "misuse[d] its unequal financial power by creating a situation which crippled Colonial financially and which caused the factories to deal directly with [it]." J.A. 234–35.

nial's recovery for breach of contract. Therefore, the district court trebled the UDTPA damages to $124,416.24. This appeal followed.

## II.

The primary thrust of Bassett's appeal focuses on Number 16 of the jury instructions ("Instruction 16" or "the Instruction"), which the district court adopted from Colonial's proposed instructions. Instruction 16 reads, in its entirety:

> I further instruct you that warranting a shipment to be without defects does not mean that each and every part of each and every crib would have no manufacturing defects. Because any crib of a specific model breaches a warranty does not mean that the purchaser is entitled to any and all of its expenses related to all cribs of that design. In order to permit rejection of and expenses incident to an entire shipment for nonconformity the purchase must show that the defect rate was higher than agreed upon or lacking specific agreement was higher than the standard in the industry.

> To the extent that Bassett has shown that specific cribs have manufacturing defects [and] will fail to meet the warranties made by Colonial[,] Bassett is entitled to damages for breach of warranty for such cribs.

J.A. 1041. Bassett contends that the Instruction (1) caused the jury to ignore the express warranty signed by Colonial; (2) misinstructed the jury about damages in breach of warranty cases, generating confusion about the appropriate award; and (3) misinformed the jury about the law governing Bassett's breach of contract, revocation of acceptance, and implied warranty claims, so as to require a new trial. We address each argument in turn.

### A. Standard of Review

While we review a district court's decision to give or not give a jury instruction for abuse of discretion, "we conduct a de novo review of any claim that jury instructions incorrectly stated the law." *United States v. Mouzone*, 687 F.3d 207, 217 (4th Cir.2012) (citation omitted). If a party failed to properly object to a jury instruction under Federal Rule of Civil Procedure 51(c), however, we review jury instructions for plain error. *Spell v. McDaniel*, 824 F.2d 1380, 1398–99 (4th Cir.1987). In either case, we reverse "only when we can conclude that a particular jury instruction must necessarily have caused the jury to act in complete ignorance of, or to have misapplied, fundamentally controlling legal principles to the inevitable prejudice of an aggrieved party." *Id.* at 1399. The jury instructions "must be construed in light of the whole record," and "will be reversed ... 'only if the error is determined to have been prejudicial, based on a review of the record as a whole.'" *Abraham v. Cnty. of Greenville, S.C.*, 237 F.3d 386, 393 (4th Cir.2001) (citing *Wellington v. Daniels*, 717 F.2d 932, 938 (4th Cir.1983)).

### B. Preservation of Error

As a threshold matter, we must decide whether Bassett preserved its current objection to Instruction 16. Colonial contends that Bassett's objection to the Instruction below—that it was "misleading or confusing"—was insufficient to preserve the issue for appeal. *See* J.A. 866; Fed. R. Civ. Proc. 51(c)(1) ("A party who objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds for the objection."). In support of its argument, Colonial cites *Belk, Inc. v. Meyer Corp., U.S.*, 679 F.3d 146, 153 n. 6 (4th Cir.2012), in which we held that the appellant had waived its jury

instruction challenge by both failing to raise it in the opening brief and neglecting to object properly at trial. Counsel for Belk, however, did not raise a specific objection to *any* jury instruction; rather, he requested that the court administer his proposed jury instructions. *Id.* We found the "general invocation of proposed jury instructions" "insufficient to preserve the issue for our review." *Id.* The facts before us present a closer question. Bassett's terse, general objection certainly did not aid the district court in fully considering the nature of its challenge. But since Bassett's arguments fail on the merits, we prefer to rely for our affirmance on that ground, and thus proceed to a de novo review of Instruction 16.

## C. Instruction 16

### 1.

Bassett contends that the district court improperly instructed the jury with respect to express warranties when it adopted Colonial's language and stated that "warranting a shipment to be without defects does not mean that each and every part of each and every crib would have no manufacturing defects." J.A. 1041. The parties proffer competing case law in support of their respective views, none of which we ultimately find convincing. *Compare Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp.*, 72 F.3d 190, 199 (1st Cir.1995) (concluding that an express warranty guaranteeing a shipment of shoes to be "without defect" "can at most be read to mean that [the seller] was capable of producing shoes that met industry standards as to the percentage of defects") *with QVC, Inc. v. MJC America, Ltd.*, 904 F.Supp.2d 466, 492 (E.D.Pa.2012) (finding that, where the seller provided a defective product, it "broke its promise ... that all of the [products] would be free from all defects," allowing the buyer to recover recall-related costs).

As the district court's subsequent instructions adequately stated the controlling law, we conclude, without deciding whether Instruction 16 was erroneous, that any misstatement was harmless. *See Volvo Trademark Holding Aktiebolaget v. Clark Mach. Co.*, 510 F.3d 474, 485 (4th Cir.2007) ("[P]roblems in jury instructions will not warrant reversal of a jury verdict so long as, taken as a whole, the instructions adequately state the controlling legal principles."). The court's later instructions on express warranties track the North Carolina statute regarding the same. *Compare* N.C. Gen.Stat. § 25–2–313 (defining the three methods for express warranty formation) *with* J.A. 1048–50 (instructing the jury as to the same three methods for forming an express warranty). According to the court's express warranty instruction, if Bassett proved that Colonial promised "to produce cribs that were 100 percent free of manufacturing defects and of raw material defects," it would be the jury's duty to find that an express warranty existed. J.A. 1050. Further, having explained what would constitute a breach in its instructions on Colonial's claims, *id.* at 1021 ("[A] breach of contract is ... any unjustified failure to perform any promise, express or implied, that is part of the contract," and "occur[s] when a party without legal excuse fails to perform any promise which is ... part of the contract."), the court made clear that "Bassett's counterclaim can best be understood by relying on the terms ... already explained," *id.* at 1038.

Far from encouraging the jury to "ignore" the express warranty, the instructions fully explained express warranty formation and breach of contract. Indeed, it seems strange for Bassett to argue that Instruction 16 caused the jury to "ignore"

the express warranty, when breach of express warranty was the only claim on which it was successful. Since "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge," *United States v. Park*, 421 U.S. 658, 674, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975) (citation and internal quotation marks omitted), the court's accurate explanation of how to evaluate whether Colonial made an express warranty and the jury's actual finding that Colonial breached the express warranty indicate that any error did not cause the jury to "misappl[y] fundamentally controlling legal principles," *Spell*, 824 F.2d at 1399.

### 2.

■ Bassett further contends that the Instruction improperly limited the jury to awarding damages for specific, defective cribs, instead of compensating Bassett for all costs associated with recalling the crib models.

Insofar as Bassett alleges that it could recoup more than costs associated with specific, defective cribs, we agree. The North Carolina Supreme Court has held, in a case alleging breach of the warranty of fitness, that "it need not be shown that any given unit is totally unusable before a breach of warranty occurs," rejecting the argument that "every commercial unit in an order of goods manufactured under the same specifications must be shown to have become totally unusable before recovery may be had for breach of warranty with respect to the entire order." *Tenn. Carolina Transp., Inc. v. Strick Corp.*, 283 N.C. 423, 196 S.E.2d 711, 721 (1973). The court explained that the fact that nine trailers out of an order of 150 had malfunctioned, "entitle[d] [the] plaintiff to go to the jury on the breach of warranty issue with respect to all 150 trailers. It is for

the jury to determine ... whether the fitness warranty was breached as to all, part or none of the 150 trailers, and assess the damages accordingly." *Id.* at 722. Here, however, the jury made just that determination, and did not explicitly find that the cribs were defective or that the damages amounted to more than a nominal sum.

Furthermore, examining the instructions "as a whole," the court properly explained damages calculation to the jury, again rendering any error in Instruction 16 harmless. *See* J.A. 1052–55. The court instructed that "Bassett should not be denied damages simply because they cannot be calculated with exactness or high degree of mathematical certainty," J.A. 1054, and included provisions explaining incidental and consequential damages. Additionally, the district court properly instructed the jury on how to calculate damages based on the reduced value of the cribs, in keeping with the tenets of North Carolina law on damages for breach of warranty. J.A. 1053; *see Alberti v. Manufactured Homes, Inc.*, 329 N.C. 727, 407 S.E.2d 819, 826 (1991) ("In warranty actions, the measure of damages is generally the difference between the value of the goods as accepted and the value as warranted.") (citation omitted). In further compliance with North Carolina law, the court also cautioned that if the jury found a breach, but Bassett failed to prove damages or the jury did not find damages, "it would be [the jury's] duty to write a nominal amount of $1 in the blank space provided," J.A. 1055, "in recognition of technical damage resulting from the breach," *id.* at 1052; *see Hairston v. Atl. Greyhound Corp.*, 220 N.C. 642, 18 S.E.2d 166, 168 (1942) ("What is meant by nominal damages is a small trivial sum awarded in recognition of a technical injury which has caused no substantial damage.") (internal quotations and citation omitted).

If anything, the jury's damages calculation indicates not that it was confused about how to separate "defective" cribs from nondefective cribs for its calculation, but rather that it concluded that Bassett's failure to prove damages on its breach of express warranty claim required it to award the nominal sum of $1, in line with the court's instructions. Because the court properly instructed the jury that it did not have to award damages unless Bassett proved them, any misstatement with respect to what Bassett could recover on its breach of warranty claim in Instruction 16 was not prejudicial.[4]

### 3.

■ Finally, Bassett argues that because Instruction 16 implied that the existence of some crib defects would be acceptable, the Instruction clouded the jury's analysis with respect to Bassett's breach of contract, revocation of acceptance, and implied warranty of merchantability claims. Again, Bassett's argument hinges on the conclusion that the jury found the cribs defective, a conclusion belied by the jury's findings.

Under North Carolina law, Bassett needed to show that the cribs were defective at the time of sale to succeed on its claims involving the implied warranty of merchantability and revocation of acceptance. *See DeWitt v. Eveready Battery Co.*, 355 N.C. 672, 565 S.E.2d 140, 147 (2002) ("To establish a breach of implied warranty of merchantability . . . a plaintiff must prove . . . that the goods did not comply with the warranty in that the

goods were defective at the time of sale.") (citation and internal quotation marks omitted); *Harrington Mfg. Co., Inc. v. Logan Tontz Co.*, 40 N.C.App. 496, 253 S.E.2d 282, 286 (1979) (holding that to justify revocation, the plaintiff must prove, in addition to other elements, "that the goods contained a nonconformity that substantially impaired their value"). That the jury found in favor of Colonial on both of these claims indicates that it did not determine that the cribs were defective at the time Bassett accepted them. Further, because the court properly instructed the jury with respect to Bassett's implied warranty of merchantability, J.A. 1050–52, revocation of acceptance, *id.* at 1042–48, and breach of contract claims, *id.* at 1039, any error in Instruction 16 was harmless.

### III.

Bassett next contends that we should vacate the district court's UDTPA award because its dispute with Colonial was contractual, the award duplicates Colonial's recovery for breach of contract, and Instruction 16 affected the jury's assessment of the alleged unfair trade practices.[5]

### A. Standard of Review

We review the district court's legal determinations with respect to the UDTPA claim de novo. *Belk, Inc.*, 679 F.3d at 164. "We review a jury's factual findings on a UDTPA claim 'in the light most favorable to the prevailing party, and [i]f, with that evidence, a reasonable jury could return a verdict in favor of plaintiffs, [we] must

---

4. If the jury had awarded a larger sum for Colonial's breach of express warranty, indicating that it intended to compensate Bassett for the cribs that did not conform to Colonial's express warranty, Bassett's argument regarding jury confusion over damage calculation might be more persuasive. The nominal damage award of $1 indicates that, under

the court's instructions, the jury did not find that Bassett proved damages at all.

5. Because Bassett's argument with respect to Instruction 16 in the UDTPA context is largely duplicative of those just discussed, we do not repeat that analysis here.

defer to the judgment of the jury, even if [our] judgment on the evidence differs.'" *Id.* (quoting *ABT Bldg. Prods. Corp. v. Nat'l Union Fire Ins. Co. Of Pittsburgh,* 472 F.3d 99, 113 (4th Cir.2006)).

## B. Unfair Trade Practices

In order to recover under the UDTPA, a party is obliged to show: "(1) that the defendant engaged in conduct that was in or affecting commerce, (2) that the conduct was unfair or 'had the capacity or tendency to deceive,' and (3) 'that the plaintiff suffered actual injury as a proximate result of defendant's deceptive statement or misrepresentation.'" *ABT Bldg.,* 472 F.3d at 122 (citation omitted). In making this showing, the "occurrence of the alleged conduct, damages, and proximate cause are fact questions for the jury." *Id.* at 123 (citation and internal quotation marks omitted). "[W]hether [such] conduct was unfair or deceptive is a legal issue for the court." *Id.* Thus, when a jury finds a defendant committed infringing conduct, "it is then the duty of the court to determine whether, as a matter of law, such conduct constituted an unfair or deceptive trade practice." *S. Atl. Ltd. P'ship of Tenn., LP v. Riese,* 284 F.3d 518, 534 (4th Cir.2002).

In reviewing this determination, we have recognized that, "under North Carolina law, the conduct sufficient to constitute an unfair or deceptive trade practice 'is a somewhat nebulous concept,' and depends on the circumstances of the particular case." *ABT Bldg.,* 472 F.3d at 122–23 (citation omitted). However, "only practices that involve '[s]ome type of egregious or aggravating circumstances' are sufficient to violate the U[D]TPA." *Riese,* 284 F.3d at 535 (citation omitted). "Generally, a trade practice will only be deemed 'unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or

substantially injurious to consumers.'" *ABT Bldg.,* 472 F.3d at 123 (quoting *Marshall v. Miller,* 302 N.C. 539, 276 S.E.2d 397, 403 (1981)). North Carolina courts have repeatedly held that "a mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under [the UDTPA]." *Broussard v. Meineke Disc. Muffler Shops, Inc.,* 155 F.3d 331, 347 (4th Cir.1998); *see, e.g., Branch Banking & Trust Co. v. Thompson,* 107 N.C.App. 53, 418 S.E.2d 694, 700 (1992) (finding breach of contract, without substantial aggravating circumstances, insufficient to support a UDTPA claim).

■ Bassett insists that Colonial's UDTPA claim arises from the same conduct underlying its contract claims, and thus cannot support the court's finding that Bassett's conduct constituted an unfair or deceptive practice justifying an UDTPA award. The jury, however, found alleged unfair trade practices attenuated from the basic contract dispute, such as paying Colonial's suppliers not to deal with Colonial, inducing Colonial's suppliers to deal with Bassett instead of Colonial through bribery and coercion, and otherwise misusing its unequal financial power against Colonial. *See* J.A. 235, *supra* note 3.

North Carolina courts have upheld UDTPA awards for tortious interference with contract, commercial bribery, and coercive conduct, practices akin to what the jury found here. *See, e.g., United Labs., Inc. v. Kuykendall,* 322 N.C. 643, 370 S.E.2d 375, 389 (1988) (explaining that N.C. Gen.Stat. § 75–1.1 could apply "to tortious interference with contract situations"); *Media Network, Inc. v. Long Haymes Carr, Inc.,* 197 N.C.App. 433, 678 S.E.2d 671, 684 (2009) ("We also note that if a UDTP[A] claimant can establish that the defendant committed commercial bribery, that is sufficient to make the

UDTP[A] claim."); *Wilder v. Squires*, 68 N.C.App. 310, 315 S.E.2d 63, 67 (1984) (threatening not to pay plaintiff unless he agreed to a particular course of action was coercive and qualified as an unfair and deceptive trade practice). We therefore decline to disturb the award.

## C. Collection of Contract and UDTPA Damages

■ Bassett contends that Colonial should have been required to elect between contract or UDTPA damages, but should not have recovered both. Bassett's argument fails because it is premised upon the assumption or mistaken belief that Colonial's contract and UDTPA claims arise from the same improper conduct. Appellant's Br. at 46–47. While Bassett is correct that, if the "same course of conduct gives rise" to a plaintiff's breach of contract and UDTPA claims, the plaintiff may recover "either for the breach of contract, or for violation of [the UDTPA], but not for both," *Marshall v. Miller*, 47 N.C.App. 530, 268 S.E.2d 97, 103 (1980) *modified and aff'd*, 302 N.C. 539, 276 S.E.2d 397 (1981); *see United Labs., Inc. v. Kuykendall*, 335 N.C. 183, 437 S.E.2d 374, 379 (1993) (explaining that the election of remedies "prevent[s] double redress for a single wrong"), this accurate summary of North Carolina law is inapplicable here. Far from resting on the same course of conduct, the district court made clear that "[w]hile the UDTPA cause of action is partly derivative of Colonial's [breach of contract] claims," J.A. 1232, "the jury rationally viewed the conduct and the damages proximately caused by the specific UDTPA conduct as distinct from the breach of contract," *id.* at 1234.

While *some* of the same conduct—particularly the conduct alleged as unfair trade practices at 3(c)(A)–(D) of the jury verdict form—also formed the basis for Colonial's breach of contract claim, *compare* J.A. 232 *with id.* at 234, the conduct underlying Colonial's UDTPA recovery does not overlap. Specifically, the jury awarded UDTPA damages to Colonial on 3(c)(F), *id.* at 235, based on Bassett's bribery and coercion of the Chinese manufacturer YanRong. This award obviates any concerns of "duplicative" recovery.

## IV.

■ Colonial cross-appeals the district court's rejection of its request for treble contract damages. In *Gray v. North Carolina Insurance Underwriting Ass'n*, 352 N.C. 61, 529 S.E.2d 676, 684–85 (2000), the North Carolina Supreme Court addressed a similar argument that, in a case involving successful recovery for breach of contract and UDTPA claims, the court should treble the entire award. Rejecting this argument, the Supreme Court concluded that only "damages *proximately caused* by a violation of [the UDTPA] shall be trebled, not [ ] damages on every claim that happens to arise in a case involving a violation of [the UDTPA]." *Id.* Because the damages for breach of contract did not "aris[e] from a violation of [ ] § 75–1.1," they could not be trebled. *Id.* at 684. Since *Gray*, the North Carolina Court of Appeals has allowed for trebling of breach of contract damages when "the breach of contract accompanied by aggravating factors is what gave rise to the [UDTPA] claim." *See, e.g., Johnson v. Colonial Life & Accident Ins. Co.*, 173 N.C.App. 365, 618 S.E.2d 867, 871–72 (2005) ("[T]he court will not allow a defendant to divide the breach of contract action and the conduct which aggravated the breach when in substance there is but one continuous transaction amounting to unfair and deceptive trade practices.").

Colonial urges us to conclude that its contract damages "arise from" the unfair trade practices listed on the jury verdict form at J.A. 234–353(c)(A)–(D), and should

therefore be trebled. Notwithstanding Colonial's puzzling reversal from its argument that distinct conduct supports their recovery of both contract and UDTPA damages, *see supra* Part III.B, the verdict does not support Colonial's argument. While there is some overlap between the acts underlying the breach of contract claim and the alleged unfair trade practices, the jurors had the opportunity to award specific damages for each unfair trade practice. As discussed *supra*, the only practice on which they chose to award damages was the bribery and coercion claim, not the contract-related acts.

A closer look at the verdict in *Gray* further supports our decision to follow that case and reject Colonial's argument. In *Gray*, as here, the verdict form required the jury to first determine whether the parties formed a contract, and then, if the defendant breached the contract, to assess damages. *See* 529 S.E.2d at 679. The form then asked the jury to determine whether the defendant had committed any of several acts that could constitute unfair trade practices, and to asses related damages. The North Carolina Supreme Court allowed trebling of only the latter, UDTPA damages. Colonial's similarly structured verdict form—which required the jury first to determine contract damages, then to assess practices that could constitute violations of the UDTPA and determine related damages—supports our decision to affirm the district court's decision to treble only the UDTPA damages, rather than the entire jury award.

## V.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*